# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

## Appellate Docket Number 12-3798

---

## ANTHONY DOUGLAS ELONIS,

### Appellant,

### v.

## UNITED STATES OF AMERICA,

### Appellee.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
## NO. 5:11-cr-00013-LS

---

## RESPONSE OF APPELLANT ANTHONY DOUGLAS ELONIS TO THIS
## COURT'S JULY 28, 2015 ORDER FOR ADDITIONAL BRIEFING

---

RONALD H. LEVINE, ESQUIRE
ABRAHAM J. REIN, ESQUIRE
POST & SCHELL, P.C.
FOUR PENN CENTER, 13TH FLOOR
1600 JOHN F. KENNEDY BOULEVARD
PHILADELPHIA, PA 19103-2808
(215) 587-1000
COUNSEL FOR APPELLANT

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ...........................................................................1

II.   ARGUMENT.................................................................................2

    A.    This Case Should Be Remanded to the District Court for Resolution of the Applicable Intent Standard if Necessary .................2

    B.    Recklessness Does Not Suffice for Liability Under § 875 ..................3

        1.    Neither Party Argued for a Recklessness Standard Below.........7

    C.    Recklessness Is Not Sufficient to Place Alleged Threatening Communications Outside the Protection of the First Amendment .......8

        1.    Speech Carrying a Risk of Being Perceived as Threatening Often Is Core Protected Political or Artistic Speech .................8

        2.    Criminalizing Recklessly Threatening Speech Risks Unacceptably Chilling Protected Speech..................................10

        3.    On the Continuum of First Amendment Exceptions, "True Threats" Fall at the End Meriting the Most Protection.............12

    D.    The District Court's Negligence Instruction Was Not Harmless Error....................................................................................15

III.  CONCLUSION.............................................................................20

## I.    INTRODUCTION

The Supreme Court declared that "Elonis's conviction cannot stand," *Elonis v. United States*, 135 S. Ct. 2001, 2012 (2015), for good reason.  Elonis served 44 months in jail for a criminal conviction based on a "negligence" state of mind standard.  This standard enabled the government to argue in closing "that it was irrelevant whether Elonis," who testified in his own defense, "intended the postings to be threats—'it doesn't matter what he thinks.'"  *Id*. at 2007.

Whether 18 U.S.C. § 875(c) allows for a recklessness standard (it does not), whether such a standard is compatible with the First Amendment (it is not), whether this issue was raised by either party below (it was not), and whether viewed through the prism of harmless or plain error, this conviction should be reversed.  Nothing is more fundamental to a criminal prosecution than proof beyond a reasonable doubt of the appropriate state of mind.  The trial court's instruction misdirected the jury on the element of intent and subverted the jury's ability to gauge Elonis's testimony.  The Indictment should be dismissed, the conviction reversed, and the case remanded.  *See United States v. Martinez*, 2015 U.S. App. LEXIS 15681 *3-4 (11th Cir. Sept. 3, 2015); *United States v. Houston*, 2015 U.S. App. LEXIS 11810 *12 (6th Cir. July 9, 2015).

1

## II.    ARGUMENT

### A.    This Case Should Be Remanded to the District Court for Resolution of the Applicable Intent Standard if Necessary.

Because the issue of recklessness was not addressed by either party below, on initial appeal to this Court, or in briefs before the Supreme Court, Elonis's conviction should be reversed, the Indictment dismissed, and this matter remanded to the court below for further consideration should the government choose to pursue this case.  *See Martinez*, 2015 U.S. App. LEXIS 15681 at *3-4 (indictment dismissed, reversal and remand); *Houston*, 2015 U.S. App. LEXIS 11810 at *12 (reversal and remand: "[t]he customary practice is to allow full briefing and argument on the issue at the trial level[.]").  Several considerations support this approach.

*First*, contingencies may moot the issue.  For this issue to be ripe after a remand, the government would have to decide to seek to re-charge, the District Court would have to order a new trial, the matter would have to go to trial, the government would have to advocate for a recklessness standard, the District Court would have to agree, the government would have to secure a conviction, and Elonis would have to appeal.  *Second*, should all of those contingencies materialize, this Court would have the benefit of a trial record in which the evidence has been tailored to the legal standard at issue.  Even "pure" issues of law often are informed by the facts from which they arise; here, the implications of a recklessness standard may be illuminated by a complete factual record.  *Third*, this Court also would

2

have the benefit of the District Court's analysis and full briefing by the parties.

For these reasons, Elonis respectfully requests that this case be remanded to the District Court for resolution, if necessary, of the intent standard to be applied.

## B. Recklessness Does Not Suffice for Liability Under § 875.

Proof of recklessness does not suffice for liability under § 875. We have found only one court which adopted a subjective state of mind standard for § 875 and touched on the subsidiary issue of whether proof of recklessness would suffice. In *United States v. Twine*, 853 F.2d 676 (9th Cir. 1988), the Ninth Circuit ruled that § 875 is a specific intent crime and that the "level of culpability" to be proved "must exceed a mere transgression of an objective standard of acceptable behavior (e.g., negligence, recklessness)." *Id*. at 680.

The Supreme Court left open the specific subjective state of mind required for a § 875 violation, but made clear that the *mens rea* standard must "separate wrongful conduct from 'otherwise innocent conduct." Wrongdoing "must be conscious;" the "calculated purveyance" of a threat requires that the defendant "know the threatening nature of his communication." *Elonis*, 135 S. Ct. at 2010, 2011-12 (citations omitted).

Thus, "[t]here is no dispute that . . . Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id*. Put another

way, if what makes particular communicative conduct criminal under § 875 is that reasonable people feel threatened by it, then that is what the defendant has *to know*. The defendant should not be required to guess, speculate or estimate how others may perceive the communication on pain of incarceration if he is incorrect, a much more problematic assessment in the era of social media communications. *See generally United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994) (in the child pornography context, "the opportunity for reasonable mistake [as to minority status] increases significantly" due to the chasm of space and time between the alleged perpetrator and the alleged victim(s).).

Yet recklessness requires only a disregard of a substantial risk that other reasonable persons may view the speech as threatening. *See* Model Penal Code at § 2.02(2)(c). Recklessness does not *inevitably or invariably* reflect a conscious awareness of *wrongdoing*. It may reflect only a probabilistic (mis)calculation as regards an "objective" standard of acceptable behavior, *i.e.*, how others may view the speech.

The issue before the Court is not the moral culpability attending reckless behavior *per se.* Certainly, society benefits if people do not act recklessly. But the issue is whether the recklessness standard sufficiently distinguishes innocent conduct from wrongdoing in the context of social media speech and otherwise for purposes of imposing a criminal conviction and incarceration.

4

Cases cited in the *Elonis* concurrence from "a wide variety of contexts" do not resolve that question. *Elonis*, 135 S. Ct. at 2015 (Alito, J., concurring). In *Farmer v. Brennan*, 511 U.S. 825 (1994), an inmate's civil conditions-of-confinement lawsuit, the Court found that prison official recklessness must be proven to make out an Eighth Amendment violation. *Id*. at 831, 836-40. In *Tison v. Arizona*, 481 U.S. 137 (1987), a state capital punishment case concerning the mental state sufficient to subject an already-convicted felony-murder accomplice to capital punishment, the Court found that reckless indifference to the value of human life can constitute an aggravating circumstance under the Eighth Amendment. *Id*. at 149-50, 158.

*New York Times v. Sullivan,* 376 U.S. 254, 279 (1964) required knowledge or reckless disregard of falsity for defamation of a public official, but this was a private civil libel action. Finally, *Garrison v. Louisiana*, 379 U.S. 64 (1964) involved a state criminal prosecution for libel and applied the *Sullivan* standard, but the Court noted that criminal libel actions are obsolete given the availability of civil remedies and that the then-draft Model Penal Code did not contain any criminal libel statute, "reflecting a modern consensus." *Id.* at 69-70 ("[P]enal sanctions cannot be justified merely by the fact that defamation is evil or damaging to a person in ways that entitle him to maintain a civil suit[.]" (citation omitted)).

In the sphere of social media communications subject to the criminal threat

law, like that of business decision-making subject to the criminal antitrust law, the statutes "[do] not, in clear and categorical terms, precisely identify the conduct which [they] proscribe[ ]." *United States v. United States Gypsum Co.*, 438 U.S. 422, 438 (1978). For each, the risk of over-deterring socially beneficial behavior compels the conclusion that "the concepts of recklessness and negligence have no place" in determining the *mens rea.* *Id.* at 444. The Court's reasoning in *Gypsum* applies equally here:

> [T]he behavior proscribed by the [statute] is often diffi-cult to distinguish from the gray zone of socially ac-ceptable....conduct.... The imposition of criminal liabil-ity....for engaging in such conduct which only after the fact is determined to violate the statute.... without inquir-ing into the intent with which it was undertaken, holds out the distinct possibility of overdeterrence; salu-tary....conduct lying close to the borderline of impermis-sible conduct might be shunned by [those] who chose to be excessively cautious in the face of uncertainty regard-ing possible exposure to criminal punishment for even a good-faith error of judgment.

*Id.* at 440-41.

The *Gypsum* Court concluded that proof of either purpose or of action un-dertaken with knowledge of its consequences would suffice:

> [A] person who acts....intends a result of his act....under two quite different circumstances: (1) when he con-sciously desires that result, whatever the likelihood of that result happening from his conduct; and (2) when he knows that the result is practically certain to follow from his conduct, whatever his desire may be as to that result. In either circumstance, the defendants are consciously

> behaving in a way the law prohibits, and such conduct is
> a fitting object of criminal punishment.

*Id*. at 445 (citations omitted).  The second prong requires more than proof of mere recklessness, as it should for a statute which might otherwise "criminalize a broad range of apparently innocent conduct" and impose severe penalties on the unwitting.  *Liparota v. United States*, 471 U.S. 419, 426 (1985).

### 1.    Neither Party Argued for a Recklessness Standard Below.

The government vigorously advocated for the negligence standard which the District Court adopted as law of the case in ruling on pre-trial motions. Elonis argued throughout that the negligence standard was wrong.  He submitted a subjective intent instruction, which the court rejected.  The government at no time intimated that any subjective state of mind requirement, like recklessness, would suffice.  Neither party briefed this issue in the Supreme Court.  *Elonis*, 135 S. Ct. at 2012.

Where the government argues for the objective "negligence" standard then prevailing in this Circuit, requiring nothing more than volitional action, and the defendant responds by seeking a subjective intent standard which is wholly consistent with the "background assumption of our criminal law," *Liparota, supra,* 471 U.S. at 426, and which was then accepted in another Circuit (which had also rejected a recklessness standard), *Twine*, *supra*; *United States v. Bagdasarian*, 652 F.3d 1113

(9th Cir. 2011), it is hardly fair to disadvantage the defendant for not raising a third standard intermediate to the parties' positions. *Cf. generally United States v. Lanier*, 520 US 259, 266 (1997) (In considering whether the defendant had reasonable warning that the conduct at issue violated constitutional rights, "….[d]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope[.]").

Should this Court reject Elonis's request for a straight reversal and remand, and even if the Court was to find that proof of recklessness suffices, under any error standard – harmless or plain – this matter should be reversed and remanded. *Houston*, *supra*, at *11, 12-13 (noting the importance of state-of-mind instructions in threat cases and stating that "[e]ven if recklessness turns out to be the correct standard, moreover, it is by no means obvious that a reasonable jury necessarily would convict.").

### C.    Recklessness Is Not Sufficient to Remove Alleged Threatening Communications from First Amendment Protection.[1]

### 1.    Speech Carrying a Risk of Being Perceived as Threatening Often Is Core Protected Political or Artistic Speech.

Impassioned speech on issues of public concern can turn "crude," "offen-

---

[1] In its prior opinion in this case, the Court found that a "reasonable person" negligence standard is sufficient to set off "true threats" from First Amendment protection.  In response to the Court's order, Elonis now argues for a higher standard than recklessness under First Amendment principles.

sive," "vituperative," "vehement," "caustic," "unpleasantly sharp," and even "abusive." *Watts v. United States*, 394 U.S. 705, 707-08 (1969). The cases are replete with communications that might be seen as threatening: A Vietnam War protestor intimates that if drafted he intends to shoot the President; an anti-abortion activist posts images of doctors who perform abortions under the word "WANTED;" a civil rights activist tells his audience that individuals who violate a boycott could "have their necks broken."[2] This case – in which many of Elonis's online statements were open, if "vituperative," commentary on the First Amendment[3] – may fall into this category. But, of course, the Constitutional question transcends the four corners of this case.

When the stakes are at their highest, speakers express their views on the most fundamental matters in terms that may cross lines of civility with the potential to be viewed as threatening.[4] But:

---

[2] *Watts v. United States*, 394 U.S. 705 (1969); *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002) (*en banc*); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

[3] *See, e.g.*, APP-119 ("Me thinks the judge needs an education on true threat jurisprudence"); APP-116 ("Did you know it's illegal for me to say I want to kill my wife? . . . .Now it was okay for me to say it right then because I was just telling you that it's illegal for me to say[.]"); APP-112 ("This one needs its own disclaimer. These are fictitious lyrics and I'm only exercising my constitutional right to freedom of speech."); APP-398 ("Art is about pushing limits. I'm willing to go to jail for my constitutional rights. Are you?").

[4] *See, e.g.*, Associated Press, 'Pigs in a blanket' chant at Minnesota Fair riles police (Aug. 31, 2015), available at http://tinyurl.com/nbxqj2x; *The Caucus*, In

> Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause.

*Claiborne*, 458 U.S. at 928. Unencumbered speech on matters of public concern is the core of democracy. *Buckley v. Valeo*, 424 U.S. 1, 93, n. 127 (1976) (*per curiam*). Any constitutional rule of intent should create "breathing space" sufficient to preclude burdening speech that ought to be protected, even if that speech carries with it a risk of being perceived as threatening. *Snyder v. Phelps*, 562 U.S. 443, 458 (2011).

### 2. Criminalizing Recklessly Threatening Speech Risks Unacceptably Chilling Protected Speech.

Criminalizing speech for which the speaker was reckless as to its potentially threatening character sweeps too broadly. A recklessness standard requires the speaker to compute the likely, but not certain, impact of each statement on every possible reasonable audience member, a daunting task particularly in the social media context. When a speaker can be imprisoned for making a statement that the speaker knows carries a *risk* of threatening – in contrast to statements that the speaker *actually intends or knows* to be threatening – speakers may refrain from making *any* risky statements, perhaps even including ones that are objectively non-

New Documentary, Obama Confronts a Country on the Brink (March 15, 2012), available at http://tinyurl.com/otavehk; *Stamford Advocate*, Stamford labor protest gets heated (Nov. 15, 2012), available at http://tinyurl.com/nskl9sg.

threatening.

The Supreme Court has decried this danger of self-censorship:

> By dispensing with any requirement of knowledge of the contents of the book on the part of the seller, the ordinance tends to impose a severe limitation on the public's access to constitutionally protected matter. For if the bookseller is criminally liable without knowledge of the contents, and the ordinance fulfills its purpose, he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as [unprotected] literature. . . .

*Smith v. California*, 361 U.S. 147, 153-154 (1959).

Under a test that criminalizes recklessly-threatening speech, the speaker's options in the face of a risk of threatening are to (a) remain silent, or (b) find out whether the risk is real by speaking and awaiting indictment.[5]  In this way, potential threats differ fundamentally from defamatory statements.   The problem for the speaker who is aware only of a *risk* of being perceived as threatening is that the speaker has no way of ascertaining the actual danger prior to utterance.   By contrast, the defamation scenario involves not an unverifiable and subjective risk assessment, but an assertion of fact which can be determined objectively as either

---

[5] *Accord United States Gypsum*, *supra* 438 U.S. at 440-41("[C]riminal liability….for….conduct which only after the fact is determined to violate the statute….without inquiring into the intent with which it was undertaken, holds out the distinct possibility of overdeterrence.").

true or false. *New York Times Co. v. Sullivan*, 376 U.S. 254, 267 (1964).[6] The speaker who is aware of a substantial risk of *falsity* has the option of fact-checking prior to speaking; not so with the utterer of a potentially *threatening* statement: the only test available to that speaker is administered by the criminal justice system. As a result, the danger of self-censorship with respect to ideas is greater than that with respect to purported facts.

### 3.    On the Continuum of First Amendment Exceptions, "True Threats" Fall at the End Meriting the Most Protection.

The First Amendment does not protect certain categories of communications: incitement, *Brandenburg v. Ohio*, 395 U.S. 444 (1969); defamation, *Sullivan*, *supra*; fighting words, *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); obscenity, *Roth v. United States*, 354 U.S. 476 (1957), and "true threats." *Watts*, *supra*. Each exception has its own state of mind requirement.

For incitement, speech is not proscribable unless the speaker acted with the *actual purpose* of inciting imminent lawless action. *Brandenburg*, 395 U.S. at 447. For defamation of a public figure, the speaker must act with *actual knowledge* that

---

[6] "[W]hether the statement is verifiable" goes to the distinction between fact and opinion. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 9 (1990). "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch*, 418 U.S. 323, 339-340 (1974). By contrast, "there is no constitutional value in false statements of fact." *Id.*

the defamatory statement was false, or with *reckless disregard* of that fact. *Sulli-van*, 376 U.S. at 280. For "fighting words" and obscenity, speech falls into the Constitutional exception if it is volitional, regardless of the speaker's subjective state of mind. *Chaplinsky*, 315 U.S. at 573-74; *Miller v. California*, 413 U.S. 15, 25 (1973). This continuum of First Amendment exceptions and attendant states of mind reflects the core First Amendment purpose of "assur[ing] a society in which uninhibited, robust, and wide-open public debate concerning matters of public interest [will] thrive[.]" *Buckley*, 424 U.S. at 93, n. 127.

Speech that incites the listener to action merits the greatest First Amendment protection, for it is at the heart of the nation's tradition of political protest. Therefore this category of speech receives the highest level of protection: speech that might objectively be deemed "incitement" is only proscribable when uttered with *actual intent* to incite.[7]

Next on the continuum are objectively-false defamatory statements regarding public figures. Such false statements carry little value in the marketplace of

---

[7] Indeed, entirely civil speech can be perceived as menacing when *listeners* are involved in questionable activities. *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 244 F.3d 1007, 1014 (9th Cir. 2001) (noting that, given the violent fringes of many political movements past and present, "much of what was said even by nonviolent participants in these movements acquired a tinge of menace."). Yet absent a purpose to incite, this effect on listeners is not enough to remove such speech from First Amendment protection. *Id.*

ideas.[8]  Accordingly, they are afforded a lesser state of mind protection: reckless-ness as to falsity suffices.  *Sullivan*, 376 U.S. at 271-272.  Further down the con-tinuum, where the defamatory statement is objectively false but involves a private individual – removing it from the realm of core political speech – the Court has held that a negligence standard is sufficient.  *Id.*

Similarly located at the other end of the continuum are both fighting words, which risk actual and immediate violence, and obscenity, which is speech that (among other things) "lacks serious . . . artistic [or] political . . . value."  *Miller*, 413 U.S. at 24. These types of speech are least likely to shade into the political or artistic, making it appropriate that they are afforded the lowest level of protection – the reasonable person standard.

Speech that may be understood as threatening should fall on the most-protected end of the continuum.  Like incitement, potentially-threatening words, although sometimes crude and offensive, are often part of core speech at its most vital, "broadly conceived to embrace the rough competition that is so much a staple of political discourse."[9]  *United States v. Velasquez*, 772 F.2d 1348, 1357 (7th Cir. 1985).  Unlike proscribable defamatory statements, potential threats do not falsely

---

[8] *Gertz*, 418 U.S. at 339-340 ("there is no constitutional value in false state-ments of fact.").

[9] That a speaker could have chosen another means of expressing the same protected ideas is not relevant to the constitutional analysis.  *Spence v. Washing-ton*, 418 U.S. 405, 411 (1974); *see Texas v. Johnson*, 491 U.S. 397, 416 (1989).

purport to be factually true – which would void them of intrinsic constitutional value – but rather are rhetorical or conceptual in nature.  And they differ from obscenity and fighting words, which carry very little likelihood of including core protected expression.

### D. The District Court's Negligence Instruction Was Not Harmless Error.

A constitutional error at trial leading to a criminal conviction may not be ignored, and the conviction must be reversed, unless "the reviewing court may confidently say . . . that the constitutional error was harmless beyond a reasonable doubt," *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) -- *i.e.*, no reasonable person could doubt that the error "did not contribute to the verdict[.]" *Chapman v. California*, 386 U.S. 18, 24 (1967).

The error here is a series of jury instructions to the effect that Elonis's subjective state of mind need not enter into the jury's analysis at all.  Yet a defendant's subjective mental state is "the all-important element of the crime." *Elonis*, *supra*, 135 S. Ct. at 2011 (citations omitted).

> "[W]rongdoing must be conscious to be criminal." . . . [T]his principle is "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." . . .  The "central thought" is that a defendant must be "blameworthy in mind" before he can be found guilty[.]

*Id.* at 2009 (citations omitted).

The defendant's subjective intent is a quintessential jury question:

> Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury. . . .  However clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury.

*Morissette v. United States*, 342 U.S. 246, 274 (1952) (quotations omitted).  Determinations of mental state require weighing nuanced in-court evidence. Where the defendant testifies as to his mental state, his demeanor and comportment can only be assessed by the finder of fact.  *See, e.g.*, *Advanced Medical, Inc. v. Arden Medical Systems, Inc.*, 955 F.2d 188, 202 (3d Cir. 1992).

Put another way:

> If the jury may have failed to consider evidence of intent, a reviewing court cannot hold that the error did not contribute to the verdict.  The fact that the reviewing court may view the evidence of intent as overwhelming is then simply irrelevant.  To allow a reviewing court to perform the jury's function of evaluating the evidence of intent, when the jury never may have performed that function, would give too much weight to society's interest in punishing the guilty and too little weight to the method by which decisions of guilt are to be made.

*Connecticut v. Johnson*, 460 U.S. 73, 85-86 (1983) (footnote omitted).[10]

---

[10]This case differs from *Neder, Saybolt* and *Pope*. *Cf. Elonis*, 135 S. Ct. at 2018 (Alito, J., concurring).  *Neder* and *Saybolt* are false tax return cases in which the trial courts failed to instruct on materiality.  The false tax return statements at issue – respectively, a failure to report $5 million in income (as to which materiali-

Neither was the error in this case a stray misstatement, capable of being disregarded or overridden by the instructions taken as a whole. The jury charge contained a lengthy series of clear, specific instructions that the government needed to meet an objective standard, which required no evaluation of Elonis's subjective state of mind.[11] The government repeatedly hammered the same incorrect point of

---

ty was not contested at trial), and the use of fake identities and fake businesses to claim over $500,000 in refunds – were found to be "unquestionably" material because the predicate facts of record necessarily found by the jury equated to materiality as a matter of logic and law. *United States v. Saybolt*, 577 F. 3d 195, 206 (3d Cir. 2009); *accord Neder v. United States*, 527 U. S. 1, 16 (1999). In *Pope v. Illinois*, 481 U. S. 497, 504 (1987), the Supreme Court approved application of the harmless error analysis where the jury had been mis-instructed on the standard for determining whether an allegedly obscene work has social value harmless. None of these cases involve the all-important element of a defendant's subjective state of mind; conversely, a predicate fact logically linked to determining Elonis's subjective state of mind – his explanation of his conduct – was read out of this case by virtue of the erroneous jury instruction.

[11] *See* APP-549 ("The government is not required to prove that the defendant himself intended for the statement to be a true threat."); APP-558 ("They don't have to prove that it was his subjective intent to state a true threat."); APP-547 ("A statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual."); *id.* (repeating same language); APP-548 ("So would a reasonable person in the position of the defendant, have foreseen that the communication that he made would have been interpreted by the recipient as a serious expression of an intention to inflict bodily injury or take the life of an individual."); APP-551 ("[T]he test for whether any of the [communications] were true threats is an objective test which focuses on what a reasonable person in the position of the defendant as the maker of the statement would expect[.]"); APP-558 ("Whether the statement is a true threat is determined by this objective speaker standard, and that is what [sic] a reasonable person in the position of the defendant have known under

law.[12]  Between the court and the government, the jury was told no less than seven-

teen times that, in effect, Elonis's subjective mental state could be ignored.  *See*

*supra* notes 11 and 12.

Indeed, the government explicitly nullified Elonis's testimony regarding his

state of mind, saying:

> **[E]ven if you were to believe absolutely everything
> that he said to you today, it has absolutely no[ ] im-
> pact on whether or not you should find him guilty or
> not.** Because what he's talking about is, these are things
> from rap lyrics, these are fictitious stories, I like the real-

---

all the circumstances that the communication that he made would cause fear in the
recipient of the statement.").

[12] *See* APP-513 ("I keep saying this because it is the issue in this case, it's
what an objectively reasonable person would think that message would do to the
recipient, not whether or not he believes[.]"); APP-493 ("It is what a reasonable
objective person making that statement would foresee the results of that state-
ment."); APP-498 ("We . . . have to prove . . . just that he intended or not even he,
a reasonable speaker, a reasonable threatener could foresee that the language will
cause someone to be placed in fear."); APP-503 ("Would a reasonably objective
person posting this communication foresee somebody would feel threatened by it?
That is the question you need to ask."); APP-504 ("Would an objectively reasona-
ble person foresee that someone would be threatened by that message and, again, I
submit the answer is yes."); APP-505 ("I would suggest . . . that you find that  . . . a
reasonably objective person who posts something like that would know, would
foresee that that would be intimidating or threatening to them."); APP-506 ("Now,
again, the test in this case is whether a reasonable person who posts that message
would perceive that the person who received it would foresee they would think it
was a threat."); APP-507-08 ("What would a reasonable objective person who post
that kind of threat foresee its impact on somebody else?"); APP-512 ("The other
analysis comes into whether or not a reasonable objective person would foresee
that particular message as a threat, not what he intended it to be."); *id*. ("We have
to prove to you that an objective person making the threat would perceive the re-
cipients would be threatened. I submit to you today, we have proven that.").

ly violent stuff, it was my way to cope, it made me feel
better. Those are the things that he's talking about.
**Again, it doesn't matter what he thinks**.

APP-513 (emphasis added). These statements rendered irrelevant Elonis's testi-

mony that, not only did he have no intent to threaten[13], but he did not believe that a

reasonable person familiar with the context would have seen his posts as threats.[14]

The jury instructions and the government's closing also invalidated non-

testimonial evidence suggesting that Elonis did not have a subjective intent to

threaten: his disclaimers identifying the statements as commentary on the First

Amendment (*e.g.*, "I'm willing to go to jail for my Constitutional rights," APP-

398) and "fictitious" (APP-112); the fact that the bulk of the statements are in lyric

form and/or emulating – if not outright copying – popular artists who have never

been prosecuted for threats (*e.g.*, "It's illegal to say…" from the Whitest Kids U

Know, APP-333); the fact that some of the statements purported to discuss past

events, fictionalizing them (*e.g.*, "little did y'all know, I was strapped with a

bomb," APP-123); and the fact that the statements are communicated via Face-

book, a medium that magnifies the potential for a disconnect between the speaker's

---

[13] *See, e.g.*, APP-395 ("I don't want anyone to be scared"); APP-398 ("These
. . . . weren't intended for anyone to feel like I was threatening them or feel
scared."); APP-415-16 ("I'm not trying to threaten anyone.").

[14] *See, e.g.*, APP-431 ("[S]omeone who knows me knows that I'm never go-
ing to hurt anyone."); APP-465 ("I would not classify that as a threat."); APP-468
("Q: Would you agree when Jill is writing that, she is expressing fear of you? A: I
don't feel it was realistic. Q: I don't care what you feel.").

intent and the audience's understanding.

Empowered by faulty jury instructions, the government negated considera-tion of such evidence:

> [I]t's what an objectively reasonable person would think that message would do to the recipient, not whether or not he believes, if he puts a disclaimer, or he says it's fic-titious, or he says, I have protected speech, none of that matters if you find in context that a person would be in fear of that. **So those are the things that he's saying and the way that he's saying it, I would submit to you, are irrelevant**.

APP-513 (emphasis added).

Given the high bar for finding harmless error, the preeminent significance of the intent element taken from the jury, and the completeness with which it was tak-en, it is respectfully submitted that the erroneous instruction below cannot be harmless, regardless of the state of mind standard ultimately found applicable in this case.   Respectfully, this conviction "cannot stand."

## III.   CONCLUSION

Elonis's conviction should be vacated, the Indictment dismissed and the matter remanded.

POST & SCHELL, P.C.


BY:   /s/ Ronald H. Levine
       RONALD H. LEVINE, ESQUIRE
       ABRAHAM J. REIN, ESQUIRE
       Four Penn Center
       1600 John F. Kennedy Boulevard
       13th Floor
       Philadelphia, PA   19103
       215-587-1071

       Counsel for Defendant/Appellant
       Anthony Douglas Elonis

Dated:  September 17, 2015

## <u>CERTIFICATE OF SERVICE</u>

I, Abraham J. Rein, Esquire, hereby certify that on this date, September 17, 2015, a true and correct copy of the foregoing Response of Appellant Anthony Douglas Elonis to This Court's Order for Additional Briefing of July 28, 2015 was filed electronically with the U.S. Court of Appeals for the Third Circuit which in turn electronically served the following individuals:

Sherri Stephan, Esquire
Joseph LaBar, Esquire
Robert Zauzmer, Esquire
United States Attorney's Office
615 Chestnut Street, 12th Floor
Philadelphia, PA  19106
sherri.stephan2@usdoj.gov
Joseph.LaBar@usdoj.gov
bob.zauzmer@usdoj.gov

Dated:   September 17, 2015   

_____
ABRAHAM J. REIN, ESQUIRE