NO. 12-3798

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Appellee

v.

ANTHONY DOUGLAS ELONIS,
Appellant

APPEAL FROM JUDGMENT OF CONVICTION AND SENTENCE
IN CRIMINAL NO. 11-0013 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUPPLEMENTAL BRIEF FOR
APPELLEE UNITED STATES OF AMERICA

ZANE DAVID MEMEGER
United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8568

# TABLE OF CONTENTS

I.   Introduction ............................................................................. 1

II.  Background ............................................................................. 3

III. Facts ...................................................................................... 5

IV.  Argument ............................................................................. 20

    A.   Elonis Admitted Knowledge of the Nature
        of the Threats, and Therefore Admitted the
        Required Mental State, and Any Error Is
        Harmless ....................................................................... 20

    B.   Recklessness Is Also Sufficient, and Admitted ......................... 24

        1.   Recklessness as to the threatening nature
            of the communication violates the statute ...................... 25

        2.   Recklessness as to the threatening nature
            of the communication satisfies the First
            Amendment .................................................................. 30

        3.   Elonis admitted at least criminally reckless
            conduct. ...................................................................... 35

    C.   The Indictment Is Sufficient ................................................. 37

V.   Conclusion ........................................................................... 41

# TABLE OF AUTHORITIES

## Cases

*Carella v. California*,
    491 U.S. 263 (1989) ............................................................................ 24

*Chaplinsky v. New Hampshire*,
    315 U.S. 568 (1942) ............................................................................ 34

*Connecticut v. Johnson*,
    460 U.S. 73 (1983) ....................................................................... 22, 23

*Delaware v. Van Arsdall*,
    475 U.S. 673 (1986) ............................................................................ 23

*Elonis v. United States*,
    135 S. Ct. 2001 (2015) ................................................................. passim

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ............................................................................ 26

*Flores-Figueroa v. United States*,
    556 U.S. 646 (2009) ............................................................................ 40

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ....................................................................... 33-35

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060 (2011) ....................................................................... 25

*Jennings v. Stephens*,
    135 S. Ct. 793 (2015) ......................................................................... 25

*Kaley v. United States*,
    134 S. Ct. 1090 (2014) ....................................................................... 39

*Morissette v. United States*,
    342 U.S. 246 (1952) ............................................................................. 3

*Neder v. United States*,
    527 U.S. 1 (1999) ..................................................................21

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)........................................................ 33, 34

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ........................................................... 34

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ...........................................................31

*Rose v. Clark*,
    478 U.S. 570 (1986) ...................................................... 23, 24

*Safeco Insurance Co. of America v. Burr*,
    551 U.S. 47 (2007)........................................................ 25, 26

*Sandstrom v. Montana*,
    442 U.S. 510 (1979) ........................................................ 22

*Smith v. Horn*,
    120 F.3d 400 (3d Cir. 1997) ............................................. 23

*United States v. American Railway Express Co.*,
    265 U.S. 425 (1924) ......................................................... 25

*United States v. Bagdasarian*,
    652 F.3d 1113 (9th Cir. 2001) .......................................... 32

*United States v. Dotterweich*,
    320 U.S. 277 (1943)........................................................ 26

*United States v. Heineman*,
    767 F.3d 970 (10th Cir. 2014) .......................................... 32

*United States v. Houston*,
    792 F.3d 663 (6th Cir. 2015) .............................................41

*United States v. Huet,*
    665 F.3d 588 (3d Cir. 2012) ................................................................ 38

*United States v. Lane,*
    474 U.S. 438 (1986) ........................................................................... 21

*United States v. Mabie,*
    663 F.3d 322 (8th Cir. 2011) ............................................................ 32

*United States v. Martinez,*
    -- F.3d --, 2015 WL 5155225 (11th Cir. 2015) ...................................... 39

*United States v. Mussare,*
    405 F.3d 161 (3d Cir. 2005) ............................................................. 25

*United States v. Starnes,*
    583 F.3d 196 (3d Cir. 2009) ............................................................. 38

*United States v. U.S. Gypsum Co.,*
    438 U.S. 422 (1978) ..................................................................... 28, 29

*United States v. White,*
    670 F.3d 498 (4th Cir. 2012) ............................................................ 32

*United States v. X-Citement Video, Inc.,*
    513 U.S. 64 (1994) ........................................................................... 40

*Virginia v. Black,*
    538 U.S. 343 (2003) ..................................................................... 30, 31

*Watts v. United States,*
    394 U.S. 705 (1969) ..................................................................... 30, 31

*Whitney v. Horn,*
    280 F.3d 240 (3d Cir. 2002) ......................................................... 23, 24

*Yates v. Evatt,*
    500 U.S. 391 (1991) ........................................................................... 23

# Statutes and Rules

18 U.S.C. § 875(c) ..................................................................... passim

18 U.S.C. § 1001(a) ........................................................................ 38

Fla. Stat. § 836.01 et seq ................................................................ 35

Idaho Code Ann. § 18-4802 .......................................................... 35

Kan. Stat. Ann. § 21-6103 ............................................................. 35

La. Rev. Stat. Ann. § 14-47 ........................................................... 35

Mich. Comp. Laws § 750.370 ........................................................ 35

N.C. Gen. Stat. § 14-47 ................................................................. 35

N.D. Cent. Code § 12.1-15-01 ....................................................... 35

N.H. Rev. Stat. Ann. § 644:11 ....................................................... 35

Ohio Rev. Stat. Ann. § 2901.21(C)(1) ........................................... 27

Okla. Stat. Tit. 21, § 771 et seq ..................................................... 35

18 Pa. Cons. Stat. § 302 ................................................................. 27

Utah Code Ann. § 76-2-102 ........................................................... 27

Va. Code Ann. § 18.2-417 .............................................................. 35

Wis. Stat. § 942.01 ......................................................................... 35

## Miscellaneous

Wayne R. LaFave,
    1 *Substantive Criminal Law* § 5.4 n.1 (2d ed. 2003) ......................... 26

Model Penal Code § 2.02(2)(c) ................................................................. 25

# I.    Introduction

In this case, the Supreme Court held: "There is no dispute that the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Elonis v. United States,* 135 S. Ct. 2001, 2012 (2015). Defendant Anthony Elonis admitted at trial that he acted with such a mental state, that is, he knew that his communications would be viewed as threats. Accordingly, any error in the jury instructions in this case regarding mens rea was harmless beyond a reasonable doubt.

It is critical to observe that the result Elonis obtained in the Supreme Court is not the result he sought. Throughout this litigation, he sought a more stringent mens rea requirement under 18 U.S.C. § 875(c): he argued that a person could be convicted of making a threat in interstate communications only if he specifically intended to make a threat. He made this argument because that is the only conceivable basis on which a jury might reach an acquittal in this case. Faced with overwhelming evidence regarding the frightening nature of his numerous threatening communications to others, Elonis testified at trial and never disputed his awareness that others viewed his missives as threats. Instead, he asked for

exoneration solely on the claim that he himself did not intend to threaten anyone. He testified that he was engaged only in artistic expression, and if others did not appreciate that, he said, "I didn't really care what other people thought." App. 430.

Elonis failed to persuade the Supreme Court to exclusively adopt the subjective intent rule he advocated. Instead, the Court ruled that "knowledge that the communication will be viewed as a threat" is also sufficient, and such knowledge was not only undisputed in this case but admitted. For that reason, the judgment of the district court should be affirmed.

Moreover, while the Court need not reach the issue, it may apply the same result upon appropriately concluding that recklessness with regard to the nature of the communication is also sufficient for culpability. If Elonis did not actually know how the recipients would view his statements, he was certainly aware of the risk and, as he testified, he deliberately disregarded it.

In explaining these conclusions, the facts of the case as established at trial are vital. In his supplemental brief, Elonis largely ignores them. In this brief, we address them in necessary detail.

## II.    Background

Elonis was charged with five counts of violation of 18 U.S.C. § 875(c), which prohibits the transmission "in interstate or foreign commerce [of] any communication containing any threat to kidnap any person or any threat to injure the person of another." (He was convicted of four counts.) Consistent with precedent of this Court, the district court instructed the jury that the government must prove a "true threat," stating as follows:

> To constitute a true threat, the statement must communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. This is distinguished from idle or careless talk, exaggeration, something said in a joking manner or an outburst of transitory anger. A statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual.

> It is not necessary that the government prove that the defendant intended to carry out the threat or that he had the present ability to carry out the threat.

App. 546-47.

On certiorari review, the Supreme Court held that the "reasonable person" test amounted to a negligence standard of mens rea, which is insufficient. The Court held that "wrongdoing must be conscious to be criminal," *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015), quoting *Morissette v. United States*, 342 U.S. 246, 252 (1952), and thus the Court

must "read into the statute only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct." *Elonis*, 135 S. Ct. at 2010 (citations and internal quotation marks omitted).

With respect to Section 875(c), the Court explained, "'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication. . . . The mental state requirement must therefore apply to the fact that the communication contains a threat." *Id.* The Court then declared: "There is no dispute that the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id.* at 2012.

The Court left open whether proof of recklessness is sufficient, stating that the parties had not briefed or argued it, nor had any lower appellate court addressed it. The Court added, "Given our disposition, it is not necessary to consider any First Amendment issues." *Id.* In a concurring and dissenting opinion, Justice Alito expressed the view that recklessness is sufficient, and for that reason as well as others any error in this case may be harmless. *Id.* at 2014-17.

Following the remand of this matter from the Supreme Court, this Court directed that the parties address the following issues:

- 4 -

1) Whether recklessness suffices for liability under 18 U.S.C. § 875(c) and, if so, where in the record below the issue was preserved for appellate review;

2) whether, assuming that recklessness is sufficient for liability under 18 U.S.C. § 875(c), it is also sufficient for purposes of the First Amendment;

3) whether the district court's instruction to apply a negligence standard was harmless error.

## III.  Facts

The instructional error in this case is indeed harmless, because the proof that Elonis knew his communications would be viewed as threats, or was at least reckless with regard to that fact, is overwhelming and indisputable. In fact, Elonis expressly admitted his knowledge. Elonis' criminal conduct covered a span of six weeks, and during that time he was repeatedly informed that others found his statements to be threatening, even terrifying. He proceeded to continue making threats regardless, testifying that, while he was aware of the recipients' views, he simply did not care. That is knowing conduct, and at minimum is textbook criminal recklessness.

The relevant events began on October 17, 2010, when Elonis was terminated from the amusement park where he worked, Dorney Park, in Allentown, Pennsylvania. That day, he had posted a photo on Facebook,

taken a year earlier at the "Halloween Haunt" event at Dorney Park,

depicting Elonis dressed in costume with a knife held to the neck of co-

worker Amber Morrissey. On his Facebook post, Elonis added the caption

"I wish." App. 199, 203. There had been prior complaints against Elonis for

harassment of co-workers, and this incident was the last straw. Elonis was

fired.

Beginning on October 19, Elonis then made Facebook posts

threatening Dorney Park's employees and patrons. On October 19, he

wrote:

> Someone once told me that I was a firecracker. Nah. I'm a nuclear
> bomb and Dorney Park just fucked with the timer. If I was the general
> manager, I'd be on the phone with Sandusky [corporate headquarters
> of Dorney Park's owner] discussing a damage control plan. But I'm
> not and y'all haven't heard the last of Anthony Elonis.

App. 111.

On October 20, Elonis wrote a post prefaced with the disclaimer that

"[t]hese are fictitious lyrics and I am only exercising my constitutional right

to freedom of speech," which proceeded to describe an airplane attack on

Dorney Park. It concluded, "I thought I told you motherfuckers don't fuck

with me." App. 206.

Also on October 20, Dorney Park co-workers who saw Elonis'

missives discussed on Facebook their apprehension at what they clearly

perceived as threats. Elonis monitored this conversation, and thus knew exactly how his co-workers understood his statements.

In the October 20 Facebook conversation, one Dorney employee wrote to another, "I am really concerned about his mental state," adding: "I hope that Dan Hall [the chief of patrol at Dorney Park] is aware that security needs to be looking out for him, not just at employee entrance but general admission too. He could have made a couple of keys or just taken one from the property room and could get in pretty much – and could get in pretty much anywhere." App. 373. The writer also observed: "Poor Amber must be terrified." App. 374. A co-worker responded, expressing concern that Elonis might get "hurt or killed," or "hurt or kill" someone else, but this writer said he was afraid of reporting Elonis and becoming a target. He said, "It's been eating me alive all day and night trying to figure something out." App. 376-77. The first writer replied, "I'm in the same position as you are. We are watching a ticking time bomb just waiting for it to go off and don't know how to disarm it." *Id.* The second writer responded:

> See, like I want to talk to him, I want to speak to him and see if there's anything I can do. But I'm afraid it only could make things worse then him end up pissed at me then attempting to hurt or harm my family. That's why I'd love to – if there was an anonymous tip line or something, that would be great.

App. 377.

The government obtained these communications not from the writers, but from Elonis' own computer, where Elonis saved screenshots of the Facebook exchange. App. 377-78. Indeed, Elonis admitted at trial that he saved to his computer this October 20 correspondence between his former co-workers. App. 468. Yet two days later, knowing their concerns, he made a post which not only made new threats, but directly referenced the conversations he was monitoring. He wrote:

> Moles. Didn't I tell ya'll I had several? Ya'll saying I had access to keys for the fucking gates, that I have sinister plans for all my friends and must have taken home a couple. Ya'll think it's too dark and foggy to secure your facility from a man as mad as me. You see, even without a paycheck I'm still the main attraction. Whoever thought the Halloween haunt could be so fucking scary?

App. 207-08.

Similarly, Elonis made threats against his estranged wife, Tara, that are charged in the indictment, even after he knew that she was terrified by similar statements he had made, and even after a state court which reviewed the threats issued a protection from abuse order as a result. Specifically, in October 2010, Elonis unleashed a fusillade of statements on Facebook directed at Tara, that were so threatening that it prompted her to seek protection from a court. App. 288. The October 2010 postings included these statements:

"If I only knew then what I know now, I would have smothered your ass with a pillow. Dumped your body in the back seat. Dropped you off in Toad Creek and made it look like rape and murder." App. 290-91, Gov't Exh. 12. [When this threat was made, Tara was living with her father. Toad Creek is a creek that runs behind her father's residence. App. 291.]

* * *

[As an unwelcomed intruder into a Facebook communication between Tara and her sister about Halloween costume shopping, Elonis wrote:] "Fuck you, mommy. LOL. . . . Tell [name of a child of Tara and Elonis] that he should dress up as a Matricide for Halloween. I don't know what his costume would entail though. Maybe your head on a stick?" App. 291-93, Gov't Exh. 13.

* * *

"If there's any truth to these lyrics, don't they cut like a knife? Fuck you bitch! All I wanted was a wife and family to call my own. Now I'm living in the zone saying fuck this world. Like it owes me money and I'm a make it pay." App. 295, Gov't Exh. 14.

* * *

"There's one way to love ya but a thousand ways to kill ya, And I'm not gonna rest until your body is a mess, Soaked in blood and dying from all the little cuts, Hurry up and die bitch so I can bust this nut, All over your corpse from atop your shallow grave, I used to be a nice guy, then you became a slut, I guess it's not your fault you like your daddy raped you, So hurry up and die bitch so I can say I forgive you." App. 296, Gov't Exh. 15.

The state court held a hearing on the protection from abuse order

("PFA") request on November 4, 2010, which Elonis attended. Tara

presented the Facebook posts, and the court entered the PFA order. App.

251-52. Elonis thereafter continued to post the same types of threats

(dressed up with the same disclaimers as rap lyrics and the like) that led to the PFA order. These subsequent threats were charged in the indictment.

On November 7, for example, he posted his lengthy variation on a published comedy routine, in which he altered the script to refer to killing his wife, going so far as describing the planned method and attaching a diagram of the property where she was residing. The post stated:

> Hi, I'm Tone Elonis
>
> Did you know that it's illegal for me to say I want to kill my wife?
>
> It's illegal.
>
> It's indirect criminal contempt.
>
> It's one of the only sentences that I'm not allowed to say.
>
> Now it was okay for me to say it right then because I was just telling you that it's illegal for me to say I want to kill my wife.
>
> I'm not actually saying it.
>
> I'm just letting you know that it's illegal for me to say that.
>
> It's kind of like a public service.
>
> I'm letting you know so that you don't accidentally go out and say something like that.
>
> Um, but what's interesting is that it's very illegal to say I really, really think someone out there should kill my wife.
>
> That's illegal.
>
> Extremely illegal.

Very, very illegal.

But not illegal to say with a mortal launcher.

Because that's its own sentence

It's an incomplete sentence but it may have nothing to do with the sentence before that.

So that's perfectly fine.

Perfectly legal.

I also found out that it's incredibly illegal, extremely illegal to go on Facebook and say something like the best place to fire a mortar launcher at her house would be from the cornfield behind it because of easy access to a getaway road and you'd have a clear line of sight through the sun room.

Insanely illegal.

Ridiculously, wrecklessly, insanely illegal.

Yet even more illegal to show an illustrated diagram.

```
'"[___]'"''house
:::::::::^::::::::::::cornfield
::::::::::::::::::::::
::::::::::::::::::::::
::::::::::::::::::::::
#####################getaway road
```

Insanely illegal.

Ridiculously, horribly felonious.

Cause they will come to my house in the middle of the night and they will lock me up.

Extremely against the law.

Uh, one thing that is technically legal to say is that we have a group that meets Fridays at my parent's house and the password is sic semper tyrannis.

App. 116-18, 256-58, Gov't Exh. 4. Next, on November 15, Elonis posted:

Fold up your PFA and put it in your pocket.

Is it thick enough to stop a bullet?

Try to enforce an Order that is improperly granted in the first place

Me thinks the judge needs an education on true threat jurisprudence

And prison time will add zeros to my settlement which you won't see a lick because you suck dog dick in front of the children

And if worse comes to worse I've got enough explosives to take care of the state police and the Sheriff's Department.

App. 118-19, 259, Gov't Exh. 5.

Tara Elonis, not surprisingly, was terrified. She testified, "I felt like I was being stalked. I felt extremely afraid for mine and my childrens' and my families' lives." App. 255-56. Her reaction to the November 15 post: "It made me extremely afraid for my life." App. 260.

On November 16, 2010, Elonis expanded his targets to elementary school children. The threat stated:

That's it, I've had about enough

I'm checking out and making a name for myself

- 12 -

Enough elementary schools in a ten mile radius to initiate the most heinous school shooting ever imagined

And hell hath no fury like a crazy man in a Kindergarten class

The only question is . . . which one?

App. 119-20, Gov't Exh. 6.

Every other witness to the communications who testified at trial explained that they had the same reaction to the numerous frightening statements issued by Elonis as had Tara, and Elonis' co-workers who wrote on October 20. The FBI, for instance, notified local police about the school threat, understanding that they would notify the local superintendent of schools. App. 153.

Daniel Hall, the chief of patrol at Dorney Park, stated that he was so "extremely concerned" that he took steps to enhance park security, notify all staff, and inform local police and the FBI. App. 204-12. With respect to Elonis' threats to kill his wife, which Hall also saw (as he, like numerous Dorney employees, was a "friend" who received Elonis' Facebook posts), Hall stated, "I just thought to myself that his behavior is just, in my opinion, out of control." App. 218. As for the threat to a school: "my reaction when I saw this was this is totally over the line and this man is out of control." App. 219. As for Elonis' "disclaimers," "I really didn't give it much weight. I just looked at it as his way of covering up what he was

saying in the event that it would come back at him later on. . . . That was going to be his way to try to get himself out of what he had posted." App. 222.

Amber Morrissey, who had been the target of the threatening picture Elonis posted on October 17, said she had already felt scared by him, and after the posting of the picture, "I felt more threatened." App. 316-17. She said she "didn't feel safe at work" and went to security, to human resources, and then to the park's general manager, until she was told he was being fired. App. 318. Then, she did not go to school for two weeks, and skipped work when she thought he might be at the park. "And a friend and I had even chosen a hiding place that we could hide at if he ever did come to attack us that we could actually hide." App. 324. The November 15 threat to Tara Elonis made Morrissey "even more scared." App. 325. As for the disclaimers, "I didn't believe it for a second." App. 326. (Tara Elonis confirmed that Elonis had never expressed much interest in rap music, or wrote any. App. 262-63.)

Bringing home to Elonis the seriousness of his criminal conduct, and the views of all persons who saw his posts, FBI agents visited him on November 30, 2010. Later that day, once again exhibiting his disdain,

Elonis posted new threats, this time directed at one of the agents, Denise Stevens:

> You know your shit's ridiculous when you have the FBI knockin' at yo' door
>
> Little Agent lady stood so close
>
> Took all the strength I had not to turn the bitch ghost
>
> Pull my knife, flick my wrist, and slit her throat
>
> Leave her bleedin' from her jugular in the arms of her partner
>
> [laughter]
>
> So the next time you knock, you best be serving a warrant
>
> And bring yo' SWAT and an explosives expert while you're at it
>
> Cause little did y'all know, I was strapped wit' a bomb
>
> Why do you think it took me so long to get dressed with no shoes on?
>
> I was jus' waitin' for y'all to handcuff me and pat me down
>
> Touch the detonator in my pocket and we're all goin'
>
> [BOOM!]
>
> Are all the pieces comin' together?
>
> Shit, I'm just a crazy sociopath that gets off playin' you stupid fucks like a fiddle
>
> And if y'all didn't hear, I'm gonna be famous

Cause I'm just an aspiring rapper who likes the attention who happens to be under investigation for terrorism cause y'all think I'm ready to turn the Valley into Fallujah

But I ain't gonna tell you which bridge is gonna fall into which river or road

And if you really believe this shit

I'll have some bridge rubble to sell you tomorrow.

[BOOM!][BOOM!][BOOM!]

App. 122-24, Gov't Exh. 7. Agent Stevens saw this as a threat, testifying:

I was very concerned. I found them very threatening. They seemed to be escalating and getting worse with each post. The one about Dorney Park, I mean there's thousands and thousands of people that go there each day. The one with the elementary school, I myself have a kid in a local elementary school, so that was very, very concerning to me. And then the one concerning the little agent lady, I was concerned about my family because I knew that the defendant was computer savvy. I thought maybe he could find out where I lived. I told my husband to be aware. I came home, I looked around the neighborhood to make sure there was nothing suspicious.

App. 126.

In light of all of this evidence, Elonis, when he testified, never denied that he was aware that the recipients of his messages understood them to be threats. He simply testified that he did not *intend* to make threats, or to harm anyone. He said that for him espousing violent imagery was "therapeutic," and as for people's reactions, he simply did not care. He testified:

I mean I started listening to more violent music and it helped me somehow. I can't describe it. But I also decided to be creative and create my own – my own work, and I never intended to threaten everyone. I specifically put disclaimers up there. Every step of the way there was a disclaimer. If anyone – there were times when people did ask me what am I doing? Think of your children. And I would tell them – I would be rational and I would tell them I don't write for my children. This is for me, this is therapeutic. It helps me to deal with the pain. I'd never hurt my wife, I'd never hurt a child, I'd never hurt anyone. I wouldn't hurt Agent Stevens – Mrs. Stevens.

App. 394. *See also* App. 398 ("These were – these were lyrics. These – these were for entertainment purposes only. They weren't intended for anyone to feel like I was threatening them or feel scared. I didn't want anyone to feel scared."); App. 416 ("I'm trying to be outrageous, I'm trying to be shocking, but I'm not trying to threaten anyone. And I'm using a pseudonym, Ton Dougie, and I have a disclaimer everywhere on my Facebook that it was for entertainment only.").

Notably, he explained that he made the post about a shooting in a kindergarten class on the same day that he watched "Toxic Avenger," a movie in which he said a child was murdered for sport. App. 427-29. He then testified:

> Q.    And why did you think it was important, or why did you want to put something controversial on the Facebook like that?
>
> A.    Because I just wanted to be creative. You know, it just -- it was violent subject matter, but there was violent imagery, but there was no violence intended ever.

- 17 -

Q.   What did you think about, if at all, what other people might think and see?

A.   *You know, I didn't really care what other people thought.* My wife said it best, it's her Facebook, it doesn't matter what she posts on it.

App. 430 (emphasis added).

On cross-examination, he admitted that he made posts after he knew his wife was threatened by what he was saying. App. 463-65. Likewise, with regard to the co-workers who expressed concern in the correspondence he monitored:

Q.   . . . Would you agree when Jill is writing that, she is expressing fear of you?

A.   I don't feel it was realistic.

Q.   I don't care what you feel. What I'm saying and what I am asking of you is, she writes in her post that she feels threatened, she thinks you're a ticking time bomb. That's what she wrote.

A.   She wrote that.

Q.   Thank you. And you knew she wrote that?

A.   I did know she wrote that.

Q.   And it's dated October 20th, correct?

A.   It is.

. . . .

Q.   *So despite you know that people are threatened by what you say, you went on to post more of the same nature* --

*A.     One more.*

App. 469-70 (emphasis added).

In the same vein, Elonis asserted on redirect that he was reacting to people suggesting that there was something wrong with him, by writing even more provocative material.  App. 472. His attorney asked, "Why did you do that?" Elonis responded:

> Because I just – like I said, when you set the bar really low for yourself, you know, and people are lying about you and spreading rumors, you know, so *I made myself a monster*. I already had experience in – at the Halloween Haunt, so I made an on-line persona and I figured the worse I made myself seem, you know, I didn't care what people said about me.

App. 475 (emphasis added). Elonis referred to one of his posts which stated, "A man who makes a beast of himself gets rid of the pain of being a man." *Id.*[1]

---

[1] This quote is attributed to the 18th century British author Samuel Johnson.

## IV.   Argument

### A.   Elonis Admitted Knowledge of the Nature of the Threats, and Therefore Admitted the Required Mental State, and Any Error Is Harmless.

In this record, Elonis admitted that he knew that his statements were understood as threats, regardless of what he claims he intended, and that establishes mens rea under Section 875(c). *Elonis,* 135 S. Ct. at 2012 ("the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat."). Not surprisingly, throughout the trial and on appeal, Elonis pressed unsuccessfully for a ruling that only a "subjective intent to threaten" would suffice, recognizing that no other mens rea standard could possibly lead to an acquittal in this case. *See, e.g.,* Appellant's Br., *Elonis v. United States*, 2014 WL 4101234, at *22 (heading of argument in Elonis' Supreme Court brief: "The Text of Section 875(C) Requires Proof of Subjective Intent to Threaten").[2]

---

[2] Indeed, the record documents actual intent, even under that standard. Under no reasonable interpretation of the record did Elonis not intend to threaten others. The fact that he found the exercise "therapeutic" is irrelevant. Someone might find it "therapeutic" to shoot another person,

*continued . . .*

Given that there was no dispute regarding Elonis' knowledge of the threatening nature of the communications, the district court's error was harmless. In *Neder v. United States*, 527 U.S. 1, 7-15 (1999), the Court held that omission of an element from a jury's consideration may be harmless. For an error to be harmless, the reviewing court must "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error," such as where the jury instruction omits an element that "was uncontested and supported by overwhelming evidence." *Neder*, 527 U.S. at 19. The harmless-error inquiry "requires a review of the entire record," *United States v. Lane*, 474 U.S. 438, 448 n.11 (1986), and reversal is not required if it was "clear beyond a reasonable doubt that a rational jury would have found" the facts necessary to establish the missing element, *Neder*, 527 U.S. at 18.

---

but that does not abrogate intent or make the act any less criminal. Thus, the prosecutor, while informing the jury in closing argument of the objective standard that governed in this Circuit prior to the Supreme Court's decision, did not refrain from stating the obvious to the jury: "We don't have to prove he intended them to be threatening, but I would submit to you, despite the fact we don't have to prove it, that is evident in this case, that he intended it, he was mad at the world, mad at his wife, mad at law enforcement, mad at Dorney Park, he was mad, and he was lashing out to hurt them, and he was hurting them effectively because they all told you how much in fear they were by what he was doing." App. 515.

In this case, the point was not just "uncontested" – Elonis admitted that he knew that the recipients of his posts saw them as threatening. No other position was tenable – Elonis heard directly from his co-workers and his estranged wife how they viewed the statements, and even from a state court which entered a protection from abuse order upon being apprised of the threats, and from the FBI. And every time he was so informed, he continued to send more. He admitted, "I didn't really care what other people thought." App. 430. He said, "I made myself a monster." App. 475. In these circumstances, any rational jury would have found the intent element as now defined by the Supreme Court.

While not addressing the new Supreme Court standard or any of this evidence, Elonis asserts that an erroneous instruction regarding the intent element of a crime may not be a harmless error. Supp. Br. 15-16. The Supreme Court and this Court have held otherwise.

Elonis mistakenly relies on Justice Blackmun's opinion in *Connecticut v. Johnson*, 460 U.S. 73, 85-86 (1983), overlooking that it was a plurality opinion which did not command a majority and was later rejected by the Supreme Court. *Johnson* focused on whether an error in light of *Sandstrom v. Montana*, 442 U.S. 510 (1979) (holding that a jury instruction that "the law presumes that a person intends the ordinary

consequences of his voluntary acts" violates due process) may be harmless. In *Johnson*, the Court divided 4-4 on this issue.

The Court returned to the issue in *Rose v. Clark*, 478 U.S. 570 (1986), and there decisively held that an error in an intent instruction, like most constitutional errors, is subject to review for harmless error.[3] The Court stated:

> Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."

*Rose v. Clark*, 478 U.S. at 579, quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). *See also, e.g., Yates v. Evatt*, 500 U.S. 391, 402 (1991) (applying harmless error review where malice instructions were constitutionally erroneous); *Smith v. Horn*, 120 F.3d 400, 417-18 (3d Cir. 1997) (applying harmless error review where the trial court mistakenly removed from the jury the issue of intent to murder). In *Whitney v. Horn,*

---

[3] In *Johnson*, the Supreme Court of Connecticut ruled that the erroneous jury instruction regarding intent was not harmless. Justice Blackmun, writing on behalf of four justices, agreed. Justice Powell, writing a dissenting opinion on behalf of four justices, disagreed. Justice Stevens cast the fifth vote for affirmance, on the grounds that the writ of certiorari did not present a federal question. The Supreme Court, recognizing that *Johnson* did not resolve the issue, *see Rose v. Clark,* 478 U.S. at 572 n.1, thus returned to the question in *Rose v. Clark* and resolved it, in a majority opinion authored by Justice Powell.

280 F.3d 240 (3d Cir. 2002), for instance, this Court held that an error in

the intent instruction regarding a murder charge was harmless, stating:

> A verdict may still stand, despite erroneous jury instructions, where the predicate facts "conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not intend to cause the injury." *Rose v. Clark*, 478 U.S. 570, 580-81 (1986). "In that event ... [,] the jury has found, in *Winship*'s words, 'every fact necessary' to establish every element of the offense beyond a reasonable doubt." *Carella v. California*, 491 U.S. 263, 266 (1989) (per curiam) (quoting *Rose*, 478 U.S. at 580-81). That is what we have here.

*Whitney v. Horn*, 280 F.3d at 260. Likewise in this case, the jury was

misinstructed regarding the intent element, but the evidence and Elonis

himself confirmed that he had the required intent as now explained by the

Supreme Court. The instruction error was therefore harmless beyond a

reasonable doubt, and the judgment should be affirmed.

### B.    Recklessness Is Also Sufficient, and Admitted.

Alternatively, the error in this case was harmless beyond a reasonable

doubt because proof of recklessness suffices to establish liability under

Section 875(c), and Elonis at minimum admitted that he acted recklessly.[4]

---

[4] It bears noting that nothing in the Supreme Court's decision suggests any reticence with regard to the recklessness element. We take the Court at its word: it simply did not reach the issue because the parties had not briefed it, nor had any appellate court addressed it. The majority stated: "We think that is more than sufficient 'justification,' post, at 2014 (opinion

*continued . . .*

### 1.   Recklessness as to the threatening nature of the communication violates the statute.

As in many criminal contexts, proof of reckless conduct is sufficient to establish a violation of Section 875(c). The Supreme Court has consistently endorsed the Model Penal Code's formulation of criminal recklessness:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.

Model Penal Code § 2.02(2)(c), *cited in Global-Tech Appliances, Inc., v. SEB S.A.*, 131 S. Ct. 2060, 2071 (2011); *Safeco Ins. Co. of America v. Burr*,

---

of ALITO, J.), for us to decline to be the first appellate tribunal to do so." *Elonis*, 135 S. Ct. at 2013.

The government is not precluded from seeking affirmance on this ground, as this Court may affirm the district court on any ground supported by the record. *See, e.g., United States v. Mussare*, 405 F.3d 161, 168 (3d Cir. 2005). *See also Jennings v. Stephens*, 135 S. Ct. 793, 798 (2015), citing *United States v. American Railway Express Co.*, 265 U.S. 425, 435 (1924). At the same time, the government does not assert that Elonis should be restrained from seeking relief on the grounds that he did not previously advocate a recklessness standard. Elonis consistently argued that the government's proof of mens rea was insufficient and should not be held to any waiver.

The government thus argues here that recklessness as to the nature of the statement is sufficient under § 875(c), and that such a state of mind was admitted. Even if this Court disagrees with the latter assertion, and elects instead to remand the case for a new trial, it should provide guidance to the district court and affirm the propriety of a recklessness standard.

551 U.S. 47, 68 n.18 (2007); *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994). *See also Elonis*, 135 S. Ct. at 2015 (Alito, J. concurring).

As explained in Justice Alito's concurring opinion, there are compelling reasons to conclude that recklessness satisfies the mens rea element of Section 875(c). *Elonis* held that negligence, with its reliance on a reasonable-person standard, is "inconsistent with 'the conventional requirement for criminal conduct – *awareness* of some wrong doing.'" 135 S. Ct. at 2011 (emphasis in original), quoting *United States v. Dotterweich*, 320 U.S. 277, 281 (1943). But recklessness in the criminal context does not suffer from the same shortcoming: "Unlike civil recklessness, criminal recklessness . . . requires subjective knowledge on the part of the offender." *Safeco*, 551 U.S. at 68 n.18. As Justice Alito explained: "Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat but he delivers them anyway." *Elonis*, 135 S. Ct. at 2015.

Furthermore, in contrast to negligence, recklessness has a settled place in the criminal law. *See* Wayne R. LaFave, 1 *Substantive Criminal Law* § 5.4 n.1 (2d ed. 2003) ("The judges when creating common law crimes (except in the very early days) did not generally go beyond

recklessness in creating crimes."). As Justice Alito pointed out, the Supreme Court has already "described reckless conduct as morally culpable" "[i]n a wide variety of contexts." *Elonis*, 135 S. Ct. at 2015 (collecting criminal and civil cases). In contrast to the presumption against negligence, several states establish recklessness as the default mens rea for criminal statutes that are otherwise silent. *See, e.g.*, Ohio Rev. Stat. Ann. § 2901.21(C)(1); 18 Pa. Cons. Stat. § 302; Utah Code Ann. § 76-2-102.

Thus, as will be explained in more detail below, the Supreme Court has recognized that speakers may be subject to criminal sanction for libelous speech made with knowledge or reckless disregard of the statement's falsity, and that such a conviction does not offend the First Amendment. *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). A violation of Section 875(c) should be interpreted likewise.

*Elonis* held that, where a criminal statute is silent as to mens rea, the Court will "read into the statute only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct." *Elonis*, 135 S. Ct. at 2010 (citations and internal quotation marks omitted). A requirement of recklessness meets this test; it demands proof of conduct which is not only unprotected by the First Amendment but also wrongful. *See also id.* at 2015 (Alito, J.) ("And when Congress does not specify a mens rea in a

criminal statute, we have no justification for inferring that anything more than recklessness is needed. It is quite unusual for us to interpret a statute to contain a requirement that is nowhere set out in the text. Once we have reached recklessness, we have gone as far as we can without stepping over the line that separates interpretation from amendment."). A requirement of proof of recklessness demands much more than the watered-down proof Elonis describes in his supplemental brief; the government must prove beyond a reasonable doubt that the defendant was consciously aware of a substantial and unjustifiable risk that a person would perceive his statement as a threat, and went ahead and delivered the statement anyway.[5]

Elonis relies on *United States v. U.S. Gypsum Co.,* 438 U.S. 422 (1978), which determined that proof of recklessness is insufficient to

---

[5] Elonis states, "The defendant should not be required to guess, speculate or estimate how others may perceive the communication on pain of incarceration if he is incorrect, a much more problematic assessment in the era of social media communications." He asserts, "Recklessness does not inevitably or invariably reflect a conscious awareness of wrongdoing. It may reflect only a probabilistic (mis)calculation as regards an 'objective' standard of acceptable behavior, i.e., how others may view the speech." Supp. Br. 4. These are incorrect statements of the law. To repeat, recklessness involves proof that the defendant consciously disregarded a substantial and unjustifiable risk that his statement was a threat of harm to another person.

establish a criminal violation of the Sherman Act. The comparison is inapt.

*U.S. Gypsum* specifically addressed the antitrust laws, recognizing that "the

behavior proscribed by the Act is often difficult to distinguish from the gray

zone of socially acceptable and economically justifiable business conduct."

*Id.* at 440-41. The Court explained:

> The Sherman Act, unlike most traditional criminal statutes, does not, in clear and categorical terms, precisely identify the conduct which it proscribes. Both civil remedies and criminal sanctions are authorized with regard to the same generalized definitions of the conduct proscribed – restraints of trade or commerce and illegal monopolization – without reference to or mention of intent or state of mind. Nor has judicial elaboration of the Act always yielded the clear and definitive rules of conduct which the statute omits; instead open-ended and fact-specific standards like the "rule of reason" have been applied to broad classes of conduct falling within the purview of the Act's general provisions.

*Id.* at 438. Thus, the Court concluded, a criminal violation should rest on

actual unlawful intent, or actual knowledge of the wrongfulness of the

conduct.

Here, in contrast, the issue is awareness of the nature of a true threat.

This concept is not defined by a vague provision with civil as well as

criminal implications, nor is it the subject of "generalized definitions"

without "clear and definitive rules of conduct." Rather, the definition of a

true threat, like that of a defamatory statement, is well defined and involves

pernicious conduct; a true threat is "a serious expression of an intent to

commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). The antitrust context is simply inapposite. As in the case of criminal libel, there is no reason to refrain from imposing criminal liability on those who make such an unlawful statement recklessly, that is, where the speaker consciously disregards a substantial and unjustifiable risk that his statement is a threat. A requirement of proof of such reckless conduct fully satisfies the *Elonis* requirement that the court "read into the statute only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct." *Elonis*, 135 S. Ct. at 2010 (citations and internal quotation marks omitted).

### 2. Recklessness as to the threatening nature of the communication satisfies the First Amendment.

Criminal prosecution of threats made with reckless disregard of the nature of the communication comports with the First Amendment. First, the government must prove that the statement was objectively a "true threat." This requirement was established by *Watts v. United States*, 394 U.S. 705 (1969) (per curiam), which held that a threat statute "must be interpreted with the commands of the First Amendment clearly in mind," and therefore be construed only to reach a "true threat" and not "constitutionally protected speech." *Id.* at 707. Such protected speech

includes "political hyperbole" or "vehement," "caustic," or "unpleasantly sharp attacks" that fall short of true threats. *Id.* True threats, on the other hand, are "outside the First Amendment." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "The speaker need not actually intend to carry out the threat.  Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" *Black*, 538 U.S. at 359-60, quoting *R.A.V. v. City of St. Paul*, 505 U.S. at 388. Second, in light of the Supreme Court's *Elonis* holding that Section 875(c) must be interpreted to impose a mens rea requirement, we submit that the government must prove that the defendant was at least reckless with regard to the fact that the statement would be understood as "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."[6]

---

[6] The Supreme Court, in not addressing constitutional issues in *Elonis*, left open whether, consistent with the First Amendment, a "true

*continued . . .*

Such a ban on true threats made with conscious disregard of the
threatening nature of the communication serves the same salutary
purposes, and passes constitutional muster for the same reasons the
Supreme Court applied in permitting prosecution of false defamatory
statements made recklessly. In *Garrison*, the Supreme Court addressed

---

threat" may be defined solely by how a reasonable person would interpret
the statement or instead requires proof of some subjective awareness of the
threatening nature of the communication. In its prior (now vacated)
decision in this case, the Court concluded that the objective test was
constitutionally sufficient, *see* 730 F.3d at 327-32, consistent with the
majority view in the courts of appeals, *see, e.g., United States v. White*, 670
F.3d 498, 507-08 (4th Cir. 2012); *United States v. Mabie*, 663 F.3d 322,
330-31 (8th Cir. 2011). Two circuits have read *Virginia v. Black* to require
proof of an intent to threaten as a matter of First Amendment law, *see*
*United States v. Heineman*, 767 F.3d 970, 974-78 (10th Cir. 2014); *United*
*States v. Bagdasarian*, 652 F.3d 1113, 1116 (9th Cir. 2001). Although
appellant Elonis now suggests that an "intent to threaten" is
constitutionally required, *see* Supp. Br. 12-15, at oral argument in the
Supreme Court he took the position that knowledge of the threatening
nature of the communication is sufficient, at least as a statutory matter, and
he disavowed a "purpose" standard. *See* Tr. of Oral Arg. 16, 18, 25, 56
(Dec. 1, 2015). In light of the Supreme Court's statutory holding in *Elonis*
that an awareness of wrongdoing must exist to impose criminal liability
under § 875(c), in order to obtain a conviction under this statute going
forward the government will always need to prove that a defendant acted
with intent to threaten, with knowledge that the statement would be
understood as a threat, or, if the government's interpretation prevails, with
reckless disregard, i.e., with conscious awareness of the serious risk that the
statement will be interpreted as a serious expression of an intent to do
harm. Accordingly, the question of whether an objectively threatening
statement may be prosecuted under a different statute based on any lesser
mental-state standard may be left for another day, which was the course the
Supreme Court itself took in *Elonis*.

exactly the concerns raised by Elonis, that speech (particularly political

speech) must be protected from civil and criminal liability, in order to

permit robust discussion and free expression consistent with the First

Amendment. The Court concluded that the Constitution therefore protects

statements except those which are knowingly false, or are made with

reckless disregard of their truth or falsity:

> We held in *New York Times* that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. The reasons which led us so to hold in *New York Times*, 376 U.S., at 279-280, apply with no less force merely because the remedy is criminal. The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy. Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since '* * * erroneous statement is inevitable in free debate, and * * * it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive' * * *,' 376 U.S., at 271-272, only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions.

*Garrison*, 379 U.S. at 74, citing *New York Times v. Sullivan*, 376 U.S. 254

(1964). The Court, however, rejected the claim now repeated by Elonis that

reckless misstatements deserve constitutional protection:

> That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which 'are no essential

part of any exposition of ideas, and are of such slight social value as a
step to truth that any benefit that may be derived from them is clearly
outweighed by the social interest in order and morality. * * *'
*Chaplinsky v. New Hampshire*, 315 U.S. 568 [(1942)]. Hence the
knowingly false statement and the false statement made with reckless
disregard of the truth, do not enjoy constitutional protection.

*Garrison,* 379 U.S. at 75. *See also id.* at 78 ("The *New York Times* standard

forbids the punishment of false statements, unless made with knowledge of

their falsity or in reckless disregard of whether they are true or false.").

Arguably, moreover, a true threat is more harmful than libelous

statements. The latter damage reputation; the former places the recipient in

fear for her safety or even her life, and may immediately provoke violence.

The expression of a serious intent to cause someone physical injury does

not invite further debate, cannot be rebutted by the listener, and substitutes

the specter of violence for the free exchange of ideas. Accordingly, there is

no reason that threats made recklessly should enjoy more constitutional

protection than defamatory statements made recklessly.[7]

---

[7] It bears mentioning that the First Amendment restriction on
liability for defamation, requiring at least proof of reckless disregard of the
truth, applies only to statements regarding public figures and, most likely,
issues of public concern. The restriction does not apply to statements of
private interest regarding non-public figures. Thus, had Elonis made a false
statement that injured his wife's reputation – a statement far less harmful
than the posts that put her in fear for her life – he could have been found
liable in tort under a negligence standard. *See Philadelphia Newspapers,
Inc. v. Hepps*, 475 U.S. 767, 773-75 (1986) (observing that a plurality of the

*continued . . .*

Elonis insists, however, that criminal libel statutes are "obsolete." Br. 5. This observation is untrue,[8] and also beside the point. The Supreme Court in *Garrison* clearly outlined the boundaries of protected speech, and its doctrine remains binding and permits the criminal prosecution of harmful statements made with reckless disregard.

### 3. Elonis admitted at least criminally reckless conduct.

In sum, as Justice Alito concluded in his opinion in *Elonis,* recklessness is sufficient for liability under 18 U.S.C. § 875(c), and is also sufficient for purposes of the First Amendment. Given that, it is even more apparent that the district court's error in the mens rea instruction in this case was harmless beyond a reasonable doubt. As noted earlier, Elonis admitted that he actually knew that others received his communications as threats, which is all that is required for conviction. At the very least, this

---

Court has held this standard sufficient even for presumed and punitive damages for false speech about a private figure on a matter of private concern).

[8] The criminal statute at issue in *Garrison* – La. Rev. Stat. Ann. § 14:47 – remains on the books. So do many other criminal defamation statutes, which remain enforceable so long as they conform to the constitutional dictates set forth in *Garrison. See, e.g.,* Fla. Stat. § 836.01 et seq.; Idaho Code Ann. § 18-4802; Kan. Stat. Ann. § 21-6103; Mich. Comp. Laws § 750.370; N.H. Rev. Stat. Ann. § 644:11; N.C. Gen. Stat. § 14-47; N.D. Cent. Code § 12.1-15-01; Okla. Stat. tit. 21, § 771 et seq.; Va. Code Ann. § 18.2-417; Wis. Stat. § 942.01.

case presents an unambiguous example of recklessness, that is, conscious disregard of a substantial and unjustifiable risk that the communication would be viewed as a threat. Elonis stated that he knew how others viewed his statements. He testified, "I didn't really care what other people thought." App. 430. He said, "I made myself a monster." App. 475. This was obvious even without his testimony. His postings show that he read the concerns of his Dorney Park colleagues, that he was a "ticking time bomb" who would "hurt or kill" someone, and he proceeded to double down on the threats. The evidence revealed that Tara Elonis brought the defendant into court to obtain a protection from abuse order, on the basis of the terrifying messages he posted about her, and he kept making the same types of threats. *See, e.g.,* App. 118-19 ("Fold up your PFA and put it in your pocket. Is it thick enough to stop a bullet?").[9]

If he did not actually know that the statements were received as threats, that is only because he was committedly reckless with regard to that fact. In these circumstances, where the proof of recklessness was

---

[9] Tellingly, Elonis' supplemental brief just cites the handful of disclaimers he put on his missives, ignoring the undisputed evidence regarding the full content of his communications, the recipients' understanding of the communications, and his knowledge of that understanding. And as Justice Alito stated, "A fig leaf of artistic expression cannot convert such hurtful, valueless threats into protected speech." *Elonis*, 135 S. Ct. at 2017.

unassailable and indeed admitted, any rational and properly instructed jury would have found the intent element now required by the Supreme Court. For this reason as well, the error was harmless beyond a reasonable doubt.

### C.    The Indictment Is Sufficient.

In his supplemental brief, Elonis also seeks dismissal of the indictment, asserting (without quoting it) that it failed to sufficiently allege mens rea. He is wrong.

The indictment presented five counts of transmitting a threat in interstate commerce, in violation of 18 U.S.C. § 875(c), and in each count alleged that Elonis "knowingly and willfully transmitted in interstate commerce and foreign commerce, via a computer and the Internet, a threatening communication to others, that is, a communication containing a threat to injure the person of another . . . ."[10] These allegations were sufficient.

The statute makes it a crime to "transmit[] in interstate or foreign commerce any communication containing any threat to kidnap any person

---

[10]  Count Two was worded slightly (and immaterially) differently, stating that Elonis "knowingly and willfully transmitted in interstate commerce and foreign commerce, via a computer and the Internet, a communication to others, that is, a communication containing a threat to injure the person of another . . . ."

or any threat to injure the person of another." In *Elonis*, the Supreme Court added the requirement that the defendant have "awareness of some wrongdoing," *Elonis*, 135 S. Ct. at 2011  (citation omitted), and held that such a mental state requirement was satisfied by proof that the defendant acted purposely or knowingly. Here, the indictment adequately alleged "awareness of some wrongdoing" by charging that the defendant acted "knowingly." The indictment added that Elonis acted not only "knowingly" but "willfully," an additional term connoting wrongful intent. *See United States v. Starnes,* 583 F.3d 196, 210 (3d Cir. 2009) ("when 'willfully' is used in a criminal statute, and particularly where the term is used in conjunction with 'knowingly,' as it is in § 1001(a), it usually requires the government to prove that the defendant acted 'not merely "voluntarily," but with a "bad purpose,"' that is, with knowledge that his conduct was, in some general sense, 'unlawful'").

This indictment was sufficient. It tracked the language of the statute and added the mental state requirement. *See United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) ("Generally, an indictment will satisfy these requirements where it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred."). *See also*

*Kaley v. United States,* 134 S. Ct. 1090, 1097 (2014) (reviewing extensive precedent holding that an indictment returned by a properly constituted grand jury is conclusive, and courts may not inquire into the sufficiency of the evidence supporting the finding of probable cause).

In a post-*Elonis* case on which the defendant relies, *United States v. Martinez*, -- F.3d --, 2015 WL 5155225 (11th Cir. Sept. 3, 2015) (per curiam), the indictment was worded differently, and the government there conceded that it did not allege mens rea. The *Martinez* indictment charged that the defendant "did knowingly transmit in interstate commerce a communication, that is an email form response, to WFTL Radio, which communication contained a threat to injure the person of another." *Id.* at *1. There, arguably, the indictment did not clearly state that "knowingly" applied to the threatening nature of the communication. Here, in contrast, the link was clear; the indictment stated that Elonis "knowingly and willfully transmitted in interstate commerce and foreign commerce, via a computer and the Internet, a threatening communication to others, that is, a communication containing a threat to injure the person of another . . . ."[11]

---

[11]  Count Two omitted the word "threatening" once, but the import remained clear (stating that Elonis "knowingly and willfully transmitted in interstate commerce and foreign commerce, via a computer and the

*continued . . .*

As a matter of statutory construction, "courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element." *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009). *See also United States v. X–Citement Video, Inc.,* 513 U.S. 64 (1994). There is no reason to read an indictment any differently. The indictment in this case was sufficient.

Elonis also cites *United States v. Houston*, 792 F.3d 663, 666 (6th Cir. 2015), but it does not aid him. In that post-*Elonis* case, as here, the indictment alleged that the defendant acted knowingly and willfully. Notably, the Court of Appeals did not dismiss the indictment; instead, it only decided that the evidence did not support affirmance on a standard of intentional conduct or recklessness. Given that the jury was instructed on the reasonable person standard rejected in *Elonis*, the appellate court remanded for a new trial under the correct mens rea standard. *Houston* does not support Elonis' request for dismissal of the indictment.

*Houston* examined the particular evidence in that case, and concluded: "There is a 'reasonable probability' that the jury would have returned an acquittal had it been required to find a higher degree of intent

---

Internet, a communication to others, that is, a communication containing a threat to injure the person of another . . . ."

. . . no matter whether recklessness by itself will suffice or whether some form of knowledge or purpose also is required . . . ." *Id.* at 667. As explained throughout this brief, this case is very different based on the uncontroverted evidence presented. Here, Elonis admitted that he acted knowingly, or at least recklessly.

## V.    Conclusion

The evidence is undisputed that Elonis acted "with knowledge that the communication[s] will be viewed as a threat." *Elonis v. United States,* 135 S. Ct. 2001, 2012 (2015). At the very least, by his own admission, he acted recklessly, that is, with a conscious disregard for how others would view the communications. For either reason, a properly instructed jury would necessarily have reached the same verdict and found Elonis guilty of the offenses of conviction. The error in the jury instructions regarding mens rea was therefore harmless, and the judgment of the district court should be affirmed.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals
Pa. Bar No. 58126


United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8568

## CERTIFICATION

1. The undersigned certifies that this brief contains 9,927 words, exclusive of the table of contents, table of authorities, and certifications.

2. I hereby certify that the electronic version of this brief filed with the Court was automatically scanned by OfficeScan Real-Time Scan Monitor, version 10.5, by Trend Micro, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing Users

identified below through the Electronic Case Filing (ECF) system:

> Ronald H. Levine, Esquire
> Abraham J. Rein, Esquire
> Post & Schell, P.C.
> Four Penn Center, 13th Floor
> 1600 JFK Blvd.
> Philadelphia, PA  19103-2808

*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney

DATED:  October 8, 2015.